O

# UNITED  STATES  DISTRICT  COURT

# FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. SACV 09-2792 DOC (ANx) |
| Plaintiff(s), ) | |
| ) | |
| v. ) | **O R D E R** FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| ORLUN JONES, et al., ) | |
| Defendant(s). ) | |

EXHIBIT 152

Plaintiff United States of America has requested that the Court take judicial notice of Exhibit 152, the IRS Certificates of Assessment and Payments (Form 4340) for Orlun and Estela Jones' 1985 through 1992 federal income tax accounts submitted under the cover of signed Forms 2866, Certificate of Official Record, with government seals. This request is hereby GRANTED, as these documents are public records of the federal government showing facts readily determined by sources whose accuracy cannot reasonably be questioned. Fed. R. Ev. 201.

FINDINGS OF FACT

1.  On June 17, 1996, the Internal Revenue Service made federal income tax assessments against Orlun K. Jones and his wife for the years 1985 through 1992, inclusive.

2.  The tax assessments made by the IRS against Orlun K. Jones and his wife on June 17, 1996, including assessed interest and penalties, total more than $5,000,000.

3.  Of the tax assessments made against Orlun K. Jones and his wife on June 17, 1996, only about $15,800 has been paid.

4.  A Notice of Federal Tax Lien against all property and rights to property belonging to defendant Orlun K. Jones, for the 1985 through 1992 income taxes owed by Orlun K. Jones and his spouse, was filed with the County Recorder, Riverside County, California, on October 4, 1996, and was re-filed via two Notices of Federal Tax Lien, both recorded in the Riverside County recorder's office on January 5, 2006, one of which covered the tax years 1985 through 1990, and the other of which covered tax years 1991 and 1992.

5.  A Notice of Federal Tax Lien against all property and rights to property belonging to defendant Orlun K. Jones, for the 1985 through 1992 income taxes owed by Orlun K. Jones and his spouse, was filed with the County Recorder, San Bernardino County, California, on October 9, 1996, and was re-filed via two Notices of Federal Tax Lien, both recorded in the San Bernardino County recorder's office on April 4, 2006, one of which covered the tax years 1985 through 1990, and the other of which covered tax years 1991 and 1992.

6.  Record title to the property located at and commonly referred to as 15805 Lindina Avenue, Riverside, California, referred to herein as the "Lindina" property, legally described as:

> Parcel 2 of parcel map 8694, as shown by map on file in book 36, page 74 of maps, records of Riverside County, California.

is held by J. Jones, as trustee of the Mockingbird Canyon Trust.

7.  Title to the Lindina property was previously held by "Terra Libera" and was claimed by Orlun K. Jones as his property in the case of United States v. Hargis, number SACV 04-273-DOC (U.S. District Court, Central District of California).

8.  The court in the Hargis case recognized and allowed Orlun K. Jones' claim to the Lindina property; and the Receiver appointed in the Hargis case has disclaimed any interest in

2

the Lindina property.

9.  Orlun K. Jones caused title to the Lindina property to be conveyed from Terra Libera to J. Jones as trustee for the Mockingbird Canyon Trust.

10.  J. Jones is the son of Orlun K. Jones.

11.  J. Jones, as trustee for the Mockingbird Canyon Trust, holds title to the Lindina property as the nominee of Orlun K. Jones.

12.  J. Jones filed an answer in this case and appeared for trial; however, J. Jones at no time made any claim against the Lindina property.

13.  The Mockingbird Canyon Trust is an alter ego of Orlun K. Jones.

14.  Orlun K. Jones is the true owner of the Lindina property, and in 2006 Orlun K. Jones admitted this fact to Donald MacPherson.

15.  A nominee Notice of Federal Tax Lien for the 1985 through 1992 income taxes owed by Orlun K. Jones and his spouse, identifying the Lindina property and naming The Mockingbird Canyon Trust, J. Jones, Trustee, as a nominee of defendant Orlun K. Jones, was filed against the interests of Orlun K. Jones in the Lindina property and was recorded in the Riverside County Recorder's office on January 21, 2005.

16.  The nominee Notice of Federal Tax Lien for the 1985 through 1992 income taxes owed by Orlun K. Jones and his spouse that was recorded against the Lindina property  was re-filed via two Notices of Federal Tax Lien, both recorded in the Riverside County recorder's office on April 10, 2006, one of which covered the tax years 1985 through 1990, and the other of which covered tax years 1991 and 1992.

17.  FGB Realty Advisors, Inc., is the assignee of the beneficial interest in a deed of trust, whose original beneficiary was Sierra Funding, Inc., recorded in the County Recorder's office for Riverside County, California, on April 12, 1984, which purports to be a lien against the Lindina property.

18.  FGB Realty Advisors, Inc., through its successor in interest, Citimortgage, Inc., has disclaimed any interest in the Lindina property.

19.  Orlun K. Jones and Estela Jones have disclaimed any interest in the Lindina property.

20.  Record title to the property located at and commonly referred to as 7491 Bonnie Street, San Bernardino, California, referred to herein as the "Bonnie" property, legally described as:

> The South one-half of Lot 32, Tract 2289, Wolf and Yates Subdivision, in the County of San Bernardino, State of California, as per Map recorded in Book 33 of Maps, page 14, in the office of the County Recorder of said county.

is held by "Terra Libera."

21.  Record title to the Bonnie property was previously acquired by defendants Orlun K. Jones and Estela Jones as community property via a deed recorded in the County Recorder's office for San Bernardino County, California, on December 31, 1986.

22.  Orlun K. Jones and Estela Jones, husband and wife, conveyed title to the Bonnie property to Bruce Warner, a single man, via a grant deed recorded in the County Recorder's office for San Bernardino County, California, on December 31, 1986.

23.  Bruce Warner conveyed record title to the Bonnie property to Terra Libera via a quitclaim deed recorded in the County Recorder's office for San Bernardino County, California, on June 18, 1999.

24.  Orlun K. Jones claimed the Bonnie property as his property in the case of United States v. Hargis, number SACV 04-273-DOC (U.S. District Court, Central District of California).

25.  The court in the Hargis case recognized and allowed Orlun K. Jones' claim to the Bonnie property; and the Receiver appointed in the Hargis case has disclaimed any interest in the Bonnie property.

26.  In holding title to the Bonnie property, Terra Libera is acting as either the nominee or alter ego of Orlun K. Jones.

27.  To the extent that Terra Libera may be a trust, the trustee of the trust, Jane McLaughlin, has disclaimed any interest in the Bonnie property.

28.  To the extent that title to the Bonnie property may be held by the Terra Libera trust, in acting as the trustee of that trust, Jane McLaughlin has been acting as the nominee of Orlun K.

4

Jones.

29.  Orlun K. Jones is the true owner of the Bonnie property, and in 2006 Orlun K. Jones admitted this fact to Donald MacPherson.

30.  A nominee Notice of Federal Tax Lien for the 1985 through 1992 income taxes owed by Orlun K. Jones and his spouse, identifying the Bonnie property and naming Terra Libera as a nominee of defendant Orlun K. Jones, was filed against the interests of Orlun K. Jones in the Bonnie property and was recorded in the San Bernardino County Recorder's office on January 21, 2005.

31.  The nominee Notice of Federal Tax Line for the 1985 through 1992 income taxes owed by Orlun K. Jones and his spouse that was recorded against the Bonnie property, was re-filed via two Notices of Federal Tax Lien, both recorded in the San Bernardino County recorder's office on April 4, 2006, one of which covered the tax years 1985 through 1990, and the other of which covered tax years 1991 and 1992.

32.  Orlun K. Jones and Estela Jones have disclaimed any interest in the Bonnie property.

33.  Mortgage Electronic Registration Systems, Inc. ("MERS"), is the assignee of the beneficial interest in a deed of trust, whose original beneficiary was Directors Mortgage Loan Association, recorded in the County Recorder's office for San Bernardino County, California, on December 31, 1986, which is the lien holding first priority against the Bonnie property.

34.  Record title to the property located at and commonly referred to as 21586 Peak Circle, Cedar Pines Park, California, referred to herein as the "Peak Circle" property, legally described as:

> Lot 59, Tract 2165, Block 4, Cedarpines Park No. 9, in the County of San Bernardino, State of California as per map recorded in Book 32, Page 10, of Maps, in the Office of the County Recorder of said county.

is held by Orlun Jones and Estela Jones, husband and wife as community property.

35.  Acting on behalf of Orlun Jones, title to the Peak Circle property was acquired by E. Ham, Trustee of the Peak Circle Trust dated April 15, 2002, via a grant deed recorded in the County Recorder's office for San Bernardino County, California, on April 19, 2002.

36. E. Ham is the maiden name, and a pseudonym, of Estela Jones, the wife of Orlun K.

Jones.

37.  Record title to the Peak Circle property was later conveyed by Peak Circle Trust, A Land Trust, E. Ham, as Trustee, to Freedom Business Administrators, Inc., a California Corporation (hereinafter "FBAI") via a grant deed recorded in the County Recorder's office for San Bernardino County, California, on February 7, 2005.

38.  FBAI conveyed record title to the Peak Circle property to Peak Circle Trust, A Land Trust, T. Fisk, as Trustee, via a grant deed recorded in the County Recorder's office for San Bernardino County, California, on June 9, 2006.

39.  T. Fisk is the daughter of Orlun K. Jones.

40.  In holding and transferring title to the Peak Circle property E. Ham, T. Fisk, and FBAI were all acting as nominees of Orlun K. Jones.

41.  The Peak Circle trust is an alter ego of Orlun K. Jones.

42.  Peak Circle Trust, A Land Trust, T. Fisk, as Trustee, conveyed record title to the Peak Circle property to defendants Orlun Jones and Estela Jones, husband and wife as community property, via a grant deed recorded in the County Recorder's office for San Bernardino County, California, on July 9, 2010.

43.  Orlun K. Jones and Estela Jones are the true owners of the Peak Circle property.

44.  A nominee Notice of Federal Tax Lien for the 1985 through 1992 income taxes owed by Orlun K. Jones and his spouse, identifying the Peak Circle property and naming Peak Circle Trust, T. Fisk, Trustee, as a nominee of defendant Orlun K. Jones, was filed against the interests of Orlun K. Jones in the Peak Circle property and was recorded in the San Bernardino County Recorder's office on June 6, 2007.

45.  Orlun K. Jones and Estela Jones have disclaimed any interest in the Peak Circle property.

46.  Miguel G. Medina and Hilda Medina are the beneficiaries of a deed of trust recorded in the County Recorder's office for San Bernardino County, California, on April 19, 2002, which purports to be a lien against the Peak Circle property.

47.  Miguel G. Medina and Hilda Medina filed answers in this case claiming an interest in

1  the Peak Circle property, but neither Miguel G. Medina nor Hilda Medina participated in pre-

2  trial proceedings in this action, appeared for trial of this matter, or presented any evidence of any

3  amount owed to them on the deed of trust against the Peak Circle property that names them as

4  beneficiaries.

5      48.  The MacPherson Group, P.C. ("MacPherson"), is the beneficiary of a deed of trust

6  signed by E. Ham as trustee of the Peak Circle trust, which was recorded in the County

7  Recorder's office for San Bernardino County, California, on June 9, 2006, and which purports to

8  be a lien against the Peak Circle property.

9      49.  In connection with the deed of trust against the Peak Circle property given to

10  MacPherson, MacPherson was also given a promissory note dated June 9, 2006, in the face

11  amount of $2 million which identifies Orlun K. Jones and Estela Jones as the debtors on the

12  note.

13      50.  The $2 million promissory note given to MacPherson by Orlun K. Jones and Estela

14  Jones is signed only by Orlun K. Jones and Estela Jones, and identifies only Orlun K. Jones and

15  Estela Jones as debtors on the promissory note.

16      51.  When MacPherson was given the $2 million promissory note by Orlun K. Jones and

17  Estela Jones, MacPherson did not give the Joneses money or money's worth in any amount in

18  exchange for the note, nor had MacPherson "earned" the $2 million, nor had MacPherson

19  received or collected any part of the $2 million.

20      52.  The Deed of Trust against the Peak Circle property given to MacPherson provides

21  that the Deed of Trust is to secure  "payment of the sum of $2,000,000.00 with interest thereon

22  according to the terms of a promissory note or notes of even date herewith made by Trustor,"

23  and "the performance of each agreement of the Trustor . . . ."

24      53.  The purpose of giving the $2 million promissory note, and the deed of trust to the

25  Peak Circle property, to MacPherson was to secure MacPherson for fees incurred by Orlun K.

26  Jones and Estela Jones for legal services rendered to Orlun K. Jones and Estela Jones by

27  MacPherson, and to attempt to secure MacPherson for fees incurred by Orlun K. Jones and

28  Estela Jones for legal services to be rendered to them by MacPherson after the promissory note

1  was executed.

2       54. The promissory note and deed of trust against the Peak Circle property given to

3  MacPherson by Orlun K. Jones and Estela Jones, and the trustee of the Peak Circle trust,

4  provides MacPherson with a first priority claim against the Peak Circle property in the amount

5  of $33,172.00, which is the amount of fees earned by MacPherson but not paid by the Joneses as

6  of the time when the Internal Revenue Service filed its nominee lien against the Peak Circle

7  property on June 6, 2007.

8       55. The tax liens of the United States against the Peak Circle property, as set forth in the

9  nominee tax lien recorded by the IRS against the Peak Circle property on June 6, 2007, have

10  priority over any fees earned by MacPherson after the after the recording of the nominee tax

11  lien.

12       56. On December 21, 2007, a deed of trust was recorded in the County Recorder's office

13  for San Bernardino County, California, in which Michael C. Beason and Nissanart B. Beason,

14  husband and wife, purport to convey a lien interest in the Peak Circle property to Nicole Donn.

15       57. The default of Nicole Donn has been entered by the clerk in this action.

16       58. The default of Nisanart Yoousutar aka Nissanart Beason has been entered by the

17  clerk in this action.

18       59. Michael C. Beason filed an answer in this case claiming an interest in the Peak Circle

19  property, but Michael C. Beason has not participated in pre-trial proceedings in this action,

20  appeared for trial of this matter, or presented any evidence that he ever had an ownership interest

21  in the Peak Circle property.

22       60. Record title to the property located at and commonly referred to as 6123 Newcomb

23  Street, San Bernardino, California, referred to herein as the "Newcomb" property,  legally

24  described as:

25              Lot 10 of Tract No. 7294, in the County of San Bernardino, State of
              California, as per Map recorded in Book 92 of Maps, pages 91 and 92, in
26              the office of the County Recorder of said county.

27  is held by Jayson N. Jones.

28       61. Acting on behalf of Orlun Jones, title to the Newcomb property was acquired by the

8

Tefft Newcomb Trust, a Land Trust, T. Fisk, Trustee, via a grant deed recorded in the County Recorder's office for San Bernardino County, California, on April 11, 2001.

62.  In acquiring the Newcomb property T. Fisk, as trustee of the Tefft Newcomb Trust, was acting as the nominee or alter ego of Orlun K. Jones.

63.  Record title to the Newcomb property was later conveyed by the Tefft Newcomb Trust, A Land Trust, T. Fisk, as Trustee, to FBAI via a grant deed recorded in the County Recorder's office for San Bernardino County, California, on February 7, 2005.

64.  In holding title to the Newcomb property, FBAI was acting as the nominee or alter ego of Orlun K. Jones.

65.  FBAI conveyed record title to the Newcomb property to the Tefft Newcomb Trust, A Land Trust, T. Fisk, as Trustee, via a grant deed recorded in the County Recorder's office for San Bernardino County, California, on June 9, 2006.

66.  In reacquiring title to the Newcomb property, T. Fisk, as trustee of the Tefft Newcomb Trust, was acting as the nominee or alter ego of Orlun K. Jones.

67.  Tefft Newcomb Trust, A Land Trust, T. Fisk, Trustee, conveyed record title to the Newcomb property to defendant Jayson N. Jones, a single man, via a grant deed recorded in the County Recorder's office for San Bernardino County, California, on July 9, 2010.

68.  The deed to the Newcomb property that was given to Jayson N. Jones in 2010 shows that no documentary transfer tax was paid in connection with the transfer of the property to Jayson N. Jones, and thus, shows that Jayson N. Jones did not pay anything for the property.

69.  In holding title to the Newcomb property, Jayson N. Jones is acting as the nominee of Orlun K. Jones.

70.  Orlun K. Jones is the true owner of the Newcomb property, and in 2006 Orlun K. Jones admitted this fact to Donald MacPherson.

71.  A "nominee" Notice of Federal Tax Lien for the 1985 through 1992 income taxes owed by Orlun K. Jones and his spouse, identifying the Newcomb property and naming Tefft Newcomb Trust, T. Fisk, Trustee, as a nominee of defendant Orlun K. Jones, was filed against the interests of Orlun K. Jones in the Newcomb property and was recorded in the San

Bernardino County Recorder's office on June 5, 2007.

72.  When Jayson N. Jones acquired title to the Newcomb property in 2010 he took title to the property subject to the federal tax lien recorded on June 5, 2007.

73.  MERS is the holder by an Assignment of Deed of Trust recorded in the County Recorder's office for San Bernardino County, California, on July 10, 2001, of the beneficial interest in a Deed of Trust recorded in the County Recorder's office for San Bernardino County, California, on August 28, 1997, naming CTX Mortgage Company as the original beneficiary, which is the lien holding first priority against the Newcomb property.

74.  Jeffrey E. Tefft is named as the beneficiary of a deed of trust recorded in the County Recorder's office for San Bernardino County, California, on April 11, 2001, which purports to be a lien against the Newcomb property.

75.  Jeffrey E. Tefft, who is deceased, was named as a defendant in the complaint filed in this action; however, defendant Bridget Regina Rosas, formerly known as Bridgett Regina Tefft, as the representative of the Estate of Jeffrey E. Tefft, was substituted into this action in place of Jeffrey E. Tefft.

76.  The default of Bridget Regina Rosas has been entered by the clerk in this action.

77.  MacPherson is the holder of the beneficial interest in a Deed of Trust recorded in the County Recorder's office for San Bernardino County, California, on June 12, 2006, which was given to MacPherson by T. Fisk, as trustee of the Tefft Newcomb trust and which is a lien against the Newcomb property.

78.  In connection with the deed of trust against the Newcomb property given to MacPherson, MacPherson was also given a promissory note dated June 9, 2006, in the face amount of $2 million which identifies Orlun K. Jones and Estela Jones as the debtors on the note.

79.  The purpose of giving the deed of trust to the Newcomb property to MacPherson was to secure MacPherson for fees incurred by Orlun K. Jones and Estela Jones for legal services rendered to Orlun K. Jones and Estela Jones by MacPherson, and to secure MacPherson for fees incurred by Orlun K. Jones and Estela Jones for legal services to be rendered to them by

MacPherson after the deed of trust was executed.

80. The Deed of Trust against the Newcomb property given to MacPherson provides that the Deed of Trust is to secure  "payment of the sum of $2,000,000.00 with interest thereon according to the terms of a promissory note or notes of even date herewith made by Trustor," and "the performance of each agreement of the Trustor . . . ."

81. The deed of trust against the Newcomb property given to MacPherson by Orlun K. Jones and Estela Jones, and the trustee of the Tefft Newcomb trust, provides MacPherson with a second priority claim against the Peak Circle property, which is behind the first priority claim of MERS against the Newcomb property.

82. The amount of MacPherson's lien against the Newcomb property is $33,172.00, which is the amount of fees and interest thereon earned by MacPherson but not paid by the Joneses as of the time when the Internal Revenue Service filed its nominee lien against the Newcomb property on June 6, 2007.

83. The tax liens of the United States against the Newcomb property, as set forth in the nominee tax lien recorded by the IRS against the Newcomb property on June 5, 2007, have priority over any fees earned by MacPherson after the recording of the nominee tax lien on June 5, 2007.

84. The State of California Franchise Tax Board has filed a disclaimer in this action disclaiming any interest in the subject properties.

85. On November 2, 2004, the IRS mailed to Orlun K. Jones a Notice of Intent to Levy and Notice of Your Right to a Hearing for taxable years 1985 through 1992.

86. On November 23, 2004, Orlun K. Jones submitted to the IRS a Form 12153, Request for a Collection Due Process Hearing, challenging a proposed levy by the IRS to collect taxes assessed against Orlun K. Jones for the tax years 1985 through 1992..

87. On May 11, 2006, a notice of determination was issued to Orlun K. Jones by the IRS, denying the relief he requested in his Collection Due Process Hearing.

88. Orlun K. Jones appealed the notice of determination issued to him by the IRS as a result of the Collection Due Process hearing to the United States Tax Court.

89.  On June 6, 2007, the Tax Court entered an Order and Decision granting summary judgment for the government in the appeal of Orlun K. Jones of the notice of determination made by the IRS in the Collection Due Process hearing regarding the intent of the IRS to levy to collect taxes assessed against Orlun K. Jones for the years 1985 through 1992, Orlun K. Jones v. Commissioner, docket number 010990-06.

90.  On July 17, 2007, Orlun K. Jones filed a motion for reconsideration of the Tax Court's decision against him entered on June 6, 2007.

91.  On July 19, 2007, the Tax Court entered an order denying Orlun K. Jones' motion for reconsideration in Orlun K. Jones v. Commissioner, docket number 010990-06.

## CONCLUSIONS OF LAW

1.  To insure prompt and certain collection of taxes due the United States, Section 6321 of the Internal Revenue Code (26 U.S.C.), provides in relevant part that "[i]f any person liable to pay any tax neglects or refuses to pay the same" after assessment and notice and demand, the amount of the unpaid taxes, including interest and accruals "shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."  See 26 U.S.C. § 6321; See also, United States v. Security Trust & Savings Bank of San Diego, 340 U.S. 47, 51, 71 S. Ct. 111, 114 (1950).

2.  The Federal tax lien arises upon assessment of a tax, after notice and demand for payment are made and the taxpayer fails to make payment.  The lien imposed by Section 6321 arises automatically when an assessment is made, and continues until the taxpayer's liability "is satisfied or becomes unenforceable by reason of lapse of time."  See 26 U.S.C. § 6322.  The lien attaches to all property and rights to property of the taxpayer then in existence.  26 U.S.C. § 6321.  This lien is often referred to as a "secret" lien because it is not recorded.  See Law Offices of Jonathan A. Stein v. Cadle Co., 250 F.3d 716 (9th Cir. 2001).  The "secret" lien is generally good against all parties, even without notice, except as provided by statute.  United States v. Vohland, 675 F.2d 1071, 1074 (9th Cir.  1982).

3.  In impressing a lien upon "all property and rights to property" belonging to a tax

1   delinquent, Congress cast its net broadly to reach every interest in property that a taxpayer might

2   have.  See 4 Bittker, Federal Taxation of Income, Estates and Gifts ¶ 111.5.4, 111-100 (1981).

3   "Stronger language could hardly have been selected to reveal a purpose to assure the collection

4   of taxes."  See Glass City Bank v. United States, 326 U.S. 265, 267, 66 S.Ct. 108, 110 (1945).

5       4.  To analyze the appropriate attachment of a federal tax lien, a determination of the

6   taxpayer's property and rights to property arising under state law must be made.  See Aguilino v.

7   United States, 363 U.S. 509, 512-513, 80 S.Ct. 1277, 1280 (1960).  State law governs the nature

8   of the interest a taxpayer has in "property" or "rights to property" to which the tax lien could

9   attach.  See United States v. National Bank of Commerce, 472 U.S. 713, 722, 105 S.Ct. 2919,

10  2925 (1985); Aguilino v. United States, supra, at 513.  This principle follows from the fact that

11  the Internal Revenue Code "creates no property rights but merely attaches consequences,

12  federally defined, to rights created under state law."  See United States v. Bess, 357 U.S. 51, 55,

13  78 S.Ct. 1054, 1057 (1958).

14      5.  The federal tax lien attaches to property held by a taxpayer's nominee or alter ego, and

15  such property is subject to the collection of the taxpayer's tax liability.  See G.M. Leasing Corp.

16  v. United States, 429 U.S. 338, 350–51, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (the IRS "could

17  properly regard petitioner's assets as [taxpayer's] property subject to the lien under § 6321");

18  Wolfe v. United States, 798 F.2d 1241, 1244 n.3, amended 806 F.2d 1410 (9th Cir. 1986);

19  Holman v. United States, 505 F.3d 1060, 1065 (10th Cir. 2007); Scoville v. United States, 250

20  F.3d 1198, 1202–03 (8th Cir. 2001); Oxford Capital Corp. v. United States, 211 F.3d 280, 284

21  (5th Cir. 2000); LiButti v. United States, 107 F.3d 110, 120, 125 (2d Cir. 1997); Shades Ridge

22  Holding Corp. v. United States, 888 F.2d 725, 728–29 (11th Cir. 1989); Towe Antique Ford

23  Found. v. IRS, 791 F. Supp. 1450, 1454 (D. Mont. 1992), aff'd, 999 F.2d 1387 (9th Cir. 1993).

24      6.  Property is held by a nominee when someone other than the taxpayer has legal title

25  but, in substance, the taxpayer enjoys the benefits of ownership.  Oxford Capital Corp., 211 F.3d

26  at 284.  A third party is the taxpayer's nominee where "the taxpayer has engaged in a legal

27  fiction by placing legal title to property in the hands of a third party while actually retaining

28  some or all of the benefits of true ownership."  Holman, 505 F.3d at 1065; see also United States

1  v. Miller Bros. Constr. Co., 505 F.2d 1031, 1036 (10th Cir. 1974).  "[T]he nominee theory stems

2  from equitable principles.  Focusing on the relationship between the taxpayer and the property,

3  the theory attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for

4  federal tax purposes, by placing legal title to property in the hands of another while, in actuality,

5  retaining all or some of the benefits of being the true owner."  In re Richards, 231 B.R. 571, 578

6  (E.D. Pa. 1999).  See also, Black's Law Dictionary 1072 (7th ed. 1999) (defining nominee as

7  "[a] party who holds bare legal title for the benefit of others").

8       7.  California law recognizes a nominee theory of ownership.  Two recent decisions by

9  the district court for the Southern District of California cite and discuss many of the state court

10  cases that have addressed the theory.  Fourth Investment LP v. United States, 2010 WL

11  3069685, at *5 (S.D. Cal. 2010); Leeds LP v. United States, 2010 WL 3070349, at *4 (S.D. Cal.

12  2010).  Among the cases cited in those opinions is McColgan v. Walter Magee, Inc., 172 Cal.

13  182, 155 P. 995 (Cal. 1916), where the California Supreme Court held that "[p]ublic policy does

14  not permit [a debtor] to put [his property] beyond reach of his creditors while he has the

15  beneficial use of it himself."  Id., 172 Cal. at 190.  The State's highest court has thus confirmed

16  that equitable creditor's remedies can override a legal fiction.  Other California cases relied upon

17  by those two Southern District decisions include Lewis v. Hankins, 262 Cal. Rptr. 532 (Cal. Ct.

18  App. 1989) (affirming trial court's decision allowing creditor to levy and sell property owned by

19  debtor's nominees because debtor was beneficial owner); Parkmerced Co. v. City and County of

20  San Francisco, 149 Cal. App.3d 1091, 1095 (1985) (noting that one general partner held real

21  property as nominee for partnership); Baldassari v. United States, 144 Cal. Rptr. 741, 744 (1978)

22  ("[t]he validity of the tax liens depends upon whether plaintiffs are the bona fide owners of the

23  properties or are only nominees"); In re Camm's Estate, 76 Cal. App.2d 104, 112 (Cal. Ct. App.

24  1946) (relying on "the rule that a person cannot place his property or the income thereof beyond

25  the reach of his creditors so long as he himself retains the right to receive it and use it"); Bauman

26  v. Harrison, 46 Cal. App. 2d 84 (Cal. Ct. App. 1941) (stating that "appellant took title as the

27  nominee of [another party] but did not assume or agree to pay the indebtedness secured by the

28  deed of trust").  See also, United States v. Dubey, 1998 WL 835000, at *98-7055 (E.D. Cal.

1998).

8.   The California Supreme Court would likely adopt the familiar factors relied upon by many other courts in determining nominee ownership.  Although California law recognizes the theory of nominee ownership, it appears that no California state court has identified the factors involved in a nominee analysis.  See Fourth Investment, LP, 2010 WL 3069685, at *4, Leeds, 2010 WL 3070349, at *4.  The district court in Fourth Investment observed that, in the absence of state-law guidelines, the federal courts in California have used the guidelines of federal common law, citing United States v. Beretta, 2008 WL 4862509, at *7 (N.D. Cal. 2008); United States v. Lang, 2008 WL 2899819, at *5 (C.D. Cal. 2008); and Sequoia Prop. & Equip. Ltd. P'ship v. United States, 2002 WL 31409620, at *12 (E.D. Cal. 2002).  Under Ninth Circuit decisions, it was entirely appropriate for the district courts in California to consider federal common law guidelines in resolving nominee cases.

9.   The Ninth Circuit has repeatedly held that where the state's highest court has not decided an issue (here, what factors are to be considered in determining nominee ownership), "the task of the federal courts is to predict how the state high court would resolve it."  Giles v. GMAC, 494 F.3d 865, 872 (9th Cir. 2007), quoting Dimidowich v. Bell & Howell, 803 F.2d 1473, 1482 (9th Cir. 1986).  And in making this prediction, the federal courts may look "for guidance to decisions by intermediate appellate courts of the state and by courts in other jurisdictions."  Giles, 494 F.3d at 872.  See also, Burlington Ins. Co. v. Oceanic Design & Constr., Inc., 383 F.3d 940, 944 (9th Cir. 2004) ("a federal court may be aided by looking to well-reasoned decisions from other jurisdictions"); Eichacker v. Paul Revere Life Ins. Co., 354 F.3d 1142, 1145 (9th Cir. 2004) (prediction may be based upon "intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements"); Walker v. City of Lakewood, 272 F.3d 1114, 1125 (9th Cir. 2001) (same).  Moreover, the Ninth Circuit has said that it will give deference "to the district court's construction of the law of the state in which the district court sits."  Takahashi v. Loomis Armored Car Serv., 625 F.2d 314, 316 (9th Cir. 1980).  Cf. United States v. Durham Lumber Co., 363 U.S. 522, 525, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960) ("in dealing with issues of state law that enter into judgments of federal courts, we

1   are hesitant to overrule decisions by federal courts skilled in the law of particular states unless

2   their conclusions are shown to be unreasonable").   Although none of the federal district courts

3   in California has ostensibly purported to predict what factors the California Supreme Court

4   would adopt for determining nominee status, those courts have uniformly applied the same

5   factors.  And the factors routinely applied by the district courts in California are similar (and it

6   many instances identical) to those applied by courts in other jurisdictions.

7        10.  In United States v. Bell, 27 F. Supp. 2d 1191, 1195 (E.D. Cal. 1998), for example,

8   the district court held that nominee status "is determined by the degree to which a party exercises

9   control over an entity and its assets."  In support of this statement of the law, the district court

10   relied upon decisions of the Second Circuit (LiButti, 107 F.3d at 119), and the Eleventh Circuit

11   (Shades Ridge Holding Co., 888 F.2d at 729).  The district court in Bell then listed the following

12   six factors that courts have considered to be relevant in determining nominee status:[1]

13        (i)        No consideration or inadequate consideration paid by the nominee;

14        (ii)       Property placed in the name of the nominee in anticipation of a suit or occurrence

15                   of liabilities while the debtor continues to exercise control over the property;

16        (iii)      Close relationship between the debtor and the nominee;

17        (iv)      Failure to record a conveyance;

18        (v)       Retention of possession by the debtor; and

19        (vi)      Continued enjoyment by the debtor of benefits of the property.

20        Indeed, reliance upon these six factors is widespread.  As the district court stated in

---

22   1. Although most of the courts relying on these factors have referred to the true owner of the
    property as the "transferor," in this discussion the word "debtor" is used, because recent appellate
23   decisions have confirmed that a transfer of the property is not a prerequisite to the application of
    the nominee doctrine.  See Holman, 505 F.3d at 1065 (recognizing that although the nominee
24   doctrine applies when a debtor has directly transferred property to his nominee, it also applies
    when a debtor "who has never held legal title to a piece of property but who transfers money to a
25   third party and directs the third party to purchase property and place legal title in the third party's
    name," nevertheless retains all the benefits of ownership); LiButti, 107 F.3d at 125 ("[i]t is not
26   necessary, therefore, to find that [the property] was transferred from [the debtor] to [his
    nominee]; it is sufficient for nominee and constructive trust purposes if it is found * * * that [the
27   debtor] transferred his money to [his nominee] for the purchase of [the property], consistent with
    his obvious desire to secrete his assets").

1   United States v. Secapure, 2008 WL 820719, at *7 (N.D. Cal. 2008), "[c]ourts throughout the

2   Ninth Circuit rely on [these] six factors to determine nominee status."  See also, Cal Fruit Int'l v.

3   Spaich, 2006 WL 27116644, at *5 (E.D. Cal. 2006); Tri-State Equipment v. United States, 1997

4   WL 375264, at *11 (E.D. Cal. 1997).  In support of its own reliance on these factors, the district

5   court in Bell cited Towe Antique Ford, supra, a case that involved Montana law and that was

6   affirmed by the Ninth Circuit (999 F.2d 1387), and the Tenth Circuit's decision in United States

7   v. Miller Bros. Constr. Co., supra.  Other federal courts of appeals have relied upon the same, or

8   nearly the same, factors.  Oxford Capital, 211 F.3d at 284 n.1; Scoville, 250 F.3d at 1202.

9       11.  The courts, however, do not necessarily require that each of these factors be present

10   in every case.  As the Second Circuit explained in LiButti, 107 F.3d at 119, courts should avoid

11   an "over-rigid preoccupation with questions of structure, * * * and apply the preexisting and

12   overarching principle that liability is imposed to reach an equitable result."  See generally,

13   W. Elliott, Federal Tax Collections, Liens, and Levies, ¶ 9.10, p. 9-95 (2d ed. 2003) ("There are

14   no particular elements whose presence the courts always insist on to determine that property that

15   is being held in the name of a nominee is in fact the property of another," and then listing eight

16   factors, including the six listed above).  LiButti itself discusses both nominee and alter ego

17   doctrine, and, indeed, some courts have recognized that there is an overlap between the two

18   doctrines.  E.g., 911 Mgmt. LLC v. United States, 657 F. Supp. 2d 1186, 1214 (D. Ore. 2009)

19   ("[m]any of the factors overlap with the nominee analysis"); In re Callahan, 419 B.R. 109, 128

20   (Bankr. Mass. 2009), remanded on other grounds, 2010 WL 1170112 (D. Mass. 2010) ("alter

21   ego theory is similar in some respects to a nominee theory").  This makes sense because the

22   nominee and alter ego doctrines are closely related equitable creditor's remedies that focus on

23   control – in one, a debtor's control over an entity, and in the other, a debtor's control over a

24   willing nominee with respect to a specific asset.  Indeed, nominee cases may be viewed as

25   single-asset alter ego cases; although one individual cannot be the alter ego of another for all

26

27

28

1  purposes, he may serve in that role with respect to holding a specific piece of property.[2]

2      12.  That federal courts across the nation have routinely relied upon the six factors listed

3  above is not surprising.  As the Eleventh Circuit explained in Shades Ridge Holding Co.,

4  888 F.2d at 728, the standards for establishing nominee status under state and federal law "are so

5  similar that the distinction is of little moment," because "[t]he [nominee] issue under either state

6  or federal law depends upon who has 'active' or 'substantial' control."

7      13.  In view of the widespread reliance by the courts upon the six factors listed above, it is

8  reasonable to conclude that the California Supreme Court would also adopt them (or something

9  very similar to them) to determine nominee status.  Indeed, California's intermediate appellate

10 courts, although not adopting a discrete list of factors, have applied such factors in their nominee

11 determinations.  For example, in Baumann v. Harrison, 46 Cal. App.2d at 91-92, the court relied

12 upon the facts that the nominee "did not assume or agree to pay the indebtedness secured by the

13 deed of trust" (factor # 1), and that the principals "had at all times been in control and possession

14 of the premises" and had been receiving all rents from the property (factors # 5 & 6).

15     14.  In the instant case the evidence shows that defendant ORLUN K. JONES is the true

16 owner of all four of the subject properties, and that he has continuously used nominees and alter

17 egos to hold title to the properties.

18     15.  A promissory note given to defendant MacPHERSON by defendants ORLUN K.

19 JONES and ESTELA JONES in June 2006 also provides evidence that defendant ORLUN K.

20 JONES is the true owner of the properties.  That note states that it may be secured by all four of

21 the subject properties, as well as four other real properties that are not involved in this case.

22 Also, most if not all of the transfers of the titles to the properties after they were first acquired by

23 _____

24 2. The California Supreme Court would thus likely also consider its alter ego decisions when
   considering what factors to adopt in nominee cases.  And in California, alter ego doctrine is not

25 as rigid as in some states. E.g., Gordon v. Aztec Brewing Co., 33 Cal.2d 514, 523, 203 P.2d 522,
   527 (Cal. 1949) ("[i]t is not necessary that the plaintiff prove actual fraud.  It is enough if the

26 recognition of the two entities as separate would result in an injustice"); Paul v. Palm Springs

27 Homes, Inc., 192 Cal. App.2d 858, 862, 13 Cal. Rptr. 860, 862 (Cal. App. 1961) ("[t]he
   conditions under which a corporate entity may be disregarded vary according to the

28 circumstances in each case").

or on behalf of defendant ORLUN K. JONES were made for no consideration, as is reflected on most of the recorded deeds.  Further, defendant Orlun K. Jones admitted to his counsel, Donald MacPherson, that all of the subject properties were owned by Orlun K. Jones, and that the trusts and other entities that held title to the properties were acting as nominees for Orlun K. Jones. Two of the properties, the Lindina and Bonnie properties, were claimed by Orlun K. Jones as his in the case of United States v. Hargis, number SACV 04-273-DOC (U.S. District Court, Central District of California), and the court in that case recognized and allowed Orlun K. Jones' claim to the Lindina and Bonnie properties. All of these facts, taken as a whole, clearly show that the subject properties are the property of defendant ORLUN K. JONES.  The Bonnie property is now owned by defendants ORLUN K. JONES and ESTELA JONES directly.  The Lindina and Peak Circle properties are held in the names of trusts that are the nominees or alter egos of defendant ORLUN K. JONES.  And the Newcomb property was transferred to defendant JAYSON N. JONES for no consideration at a time when the federal tax liens had already attached to the property.  Having established the federal tax liens against the subject properties, and the property interests of defendant ORLUN K. JONES in the subject properties, it is well settled that the United States may foreclose its liens against the subject properties.  See e.g., United States v. Rodgers, 461 U.S. 677, 103 S.Ct. 2132, 461 L.Ed.2d 236 (1983).

16.  Section 6323 of the Internal Revenue Code, Title 26, U.S.C., protects certain purchasers, and certain classes of creditors, from the "secret" lien under § 6321 that arises upon the assessment of a tax.  In order for the IRS to assert priority against these protected classes, Notice of the Federal Tax Lien (an NFTL) must be recorded.  26 U.S.C. § 6323(a).  These protected classes include purchasers, holders of security interests, mechanic's lienors, and judgment lien creditors.  26 U.S.C. § 6323(a).  A "purchaser" within the meaning of the statute is defined as a "person who, for adequate and full consideration in money or money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchasers without actual notice."  26 U.S.C. § 6323(h)(6).  Adequate and full consideration "means a consideration ... having a reasonable relationship to the true value of the interest in property acquired."  26 C.F.R. § 301.6323(h)-1(f)(3); U.S. v. McCombs,

30 F.3d 310 (2ⁿᵈ Cir. 1994). If a transfer of a taxpayer's property is made to a party that does not fit one of the enumerated exceptions in 26 U.S.C. § 6323, that party takes the property subject to the IRS lien, whether or not such person is acting as a nominee for the taxpayer. <u>United States v. Bess</u>, 357 U.S. 51, 57 (1958), <u>Ripley v. Commissioner</u>, 102 T.C. 654 (1994), <u>U.S. v. Williams</u>, 581 F.Supp. 756, 759 (C.D. Ga. 1982) (property purchased by third party using taxpayer's money, who also enjoyed the benefits of the property, was in fact owned by the taxpayer and subject to IRS lien). In the instant case, none of the current title holders of the subject properties qualify as a "purchaser" under § 6323(a).

17. Defendant MacPHERSON claims liens against the Peak Circle and Newcomb properties pursuant to two Deeds of Trust recorded in the County Recorder's office for San Bernardino County on June 9, 2006, and June 12, 2006, respectively. The stated amount of the lien in the recorded Deeds of Trust, $2,000,000.00, is the amount that MacPherson now claims against the properties. However, MacPherson's lien claims against the properties are supported only by the legal fees the Joneses incurred to MacPherson but did not pay. MacPherson's first alternative claim to his claim for the entire $2 million, is a claim for <u>all</u> of the legal fees, and interest on such, that were incurred by the Joneses but were never paid, in the amount of $162,204.00, which is based on MacPherson's accounts receivable records. However, that claim includes amounts incurred by the Joneses and billed by defendant MacPherson <u>after</u> the nominee lien notices against the Peak Circle and Newcomb properties were filed by the IRS on June 5 and 6, 2007. MacPherson's legal fees arising after June 6, 2007, were not a debt owed to MacPherson at the time the IRS nominee lien notices were filed, i.e., the amounts were not known at the time and were therefore not "choate." A lien is perfected <u>vis</u> a <u>vis</u> the federal tax lien only when it is choate, i.e., when the identity of the lienor, the property subject to the lien, and the <u>amount</u> of the lien are established. <u>See</u> <u>United States v. New Britain</u>, 347 U.S. 81, 74 S.Ct. 367 at 369, 98 L.Ed. 520 at 525 (1954), and <u>United States v. McDermott</u>, 507 U.S. 447, 113 S.Ct. 1526 at 1528, 123 L.Ed.2d 128 at 136 (1993). <u>See also</u> <u>U.S. v. Pioneer American Ins. Co.</u>, 374 U.S. 84 at 86, 83 S.Ct. 1651 at 1654 (1963) (legal fees secured by lender's mortgage agreement with the taxpayer, but incurred after tax lien was filed, were subordinate to the tax

lien).  Thus, defendant MacPherson's enforceable lien against the Peak Circle and Newcomb properties is only in the amount of $33,172.00 ($55,575.00 billed before IRS liens were recorded, including accrued interest to the dates when the IRS liens were recorded, less $22,403.00 paid by the Joneses up to that time).  The amount of MacPherson's recovery is limited to $33,172.00, the amount of the lien that was choate at the time the IRS nominee liens were recorded.

18.  The only parties who have prosecuted their claims against the subject properties are the United States, MacPherson, and MERS.  Besides the taxpayers, Orlun K. Jones and Estela Jones, all other potential claimants to the subject properties who have appeared in this action have either disclaimed any interest in the properties, or have failed to offer any evidence to show such party has any lien claim against the properties.  Those parties who have disclaimed are Jane McLaughlin, Trustee of Terra Libera Trust, FGB Realty Advisors, Inc. (through its successor in interest Citimortgage, Inc.), Robert P. Mosier, Receiver, and the State of California Franchise Tax Board.  Those parties who have appeared but failed to produce any evidence to substantiate their claims are Miguel G. Medina, Hilda Medina, and Michael C. Beason.  The federal tax liens may be foreclosed against the subject properties.  United States v. Rodgers, 461 U.S. 677, 103 S.Ct. 2132, 461 L.Ed.2d 236 (1983).

19.    a.  The only lien claims sustained against the Lindina property are the federal tax liens, in the amount owing on such tax liens at the time of the sale of the Lindina property.

b.  The first priority lien claim against the Bonnie property is the mortgage lien claim of MERS, in the amount owing to MERS at the time of sale of the Bonnie property.  The only other proven liens against the Bonnie property are the federal tax liens, in the amount owing to the government at the time of the sale of the Bonnie property.  The federal tax liens are subordinate to the lien of MERS against the Bonnies property.

c.  The only lien claims against the Peak Circle property presented at trial are the claims of MacPherson and the United States.  MacPherson's lien is recognized as the first priority lien, but only in the amount of $33,172.00, the amount that was choate vis a vis

the federal nominee tax lien at the time the federal tax lien against the Peak Circle property was recorded.  The only other proven liens against the Peak Circle property are the federal tax liens, in the amounts owing to the IRS at the time of the sale of the Peak Circle property.

      d.  The only lien claims presented against the Newcomb property are those of MERS, MacPherson, and the United States.  The first priority lien claim against the Newcomb property is the mortgage lien claim of MERS, in the amount owing to MERS at the time of sale of the Newcomb property.  The other two litigated lien claims against the Newcomb property are the claims of MacPherson and the United States.  MacPherson's lien is recognized as the second priority lien, but only in the amount of $33,172.00, the amount that was choate vis a vis the federal nominee tax lien at the time the federal tax lien against the Newcomb property was recorded.  The only other proven liens against the Newcomb property are the federal tax liens, in the amounts owing to the IRS at the time of the sale of the Newcomb property, with the government's tax liens being subordinate to the lien of MERS.

IT IS SO ORDERED.

DATED: February 17, 2012

                                              *David O. Carter*

                                                   DAVID O. CARTER

                                   United States District Judge